IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **GREGORY NELSON**<br>c/o The Chandra Law Firm LLC<br>1265 W. 6th Street, Suite 400<br>Cleveland, OH 44113<br><br>*Plaintiff,*<br>vs.<br><br>**CUYAHOGA COUNTY**<br>c/o Cuyahoga County Department of Law<br>2079 East Ninth Street<br>Cleveland, Ohio 44115<br><br>and<br><br>**ARMOND BUDISH**<br>c/o Cuyahoga County Department of Law<br>2079 East Ninth Street<br>Cleveland, Ohio 44115<br><br>and<br><br>**ERIC IVEY**<br>1691 Oakham Road<br>Euclid, OH 44117<br><br>and<br><br>**GREGORY CROUCHER**<br>65 Starbright Ct.<br>Pagosa Springs, CO 81147<br><br>and<br><br>**JERMAINE CLEMENTS**<br>c/o Cuyahoga County Department of Law<br>2079 East Ninth Street<br>Cleveland, Ohio 44115<br><br>*Defendants.* | Case No. _____<br><br>Judge _____ |

**PLAINTIFF'S COMPLAINT WITH JURY DEMAND**

## NATURE OF THE ACTION

1.      This is a civil-rights action to redress acts of unlawful and sadistic violence committed by a corrections officer who beat Gregory Nelson without justification.

2.      Cuyahoga County adopted customs, policies, patterns, and practices of brutalizing incarcerated citizens, failing to properly train and supervise its employees, and allowing corrections officers to inflict punitive violence upon the people in their custody.

3.      Cuyahoga County leadership failed to properly train employees, coddled corrections officers who perpetrated sadistic violent acts against the people in their custody and mismanaged the jail system through chronic understaffing and overcrowding–all while pushing to add more detainees. The unprecedented humanitarian crisis at the Cuyahoga County Corrections Center, which has caused so much harm through the unconstitutional mistreatment of those in custody, was an entirely foreseeable and avoidable disaster. But from the top down, those with power deliberately abused it—mistreating inmates and employees alike—and for that they must account.

4.      In the fall of 2018, the United States Marshals Service conducted a review of the facility. Released in November 2018, the Marshals Report was a scathing rebuke of the jail's generally inhumane conditions—from food to hygiene to medical care—and especially of the use of excessive force as a punitive measure.

5.      The Inspector General for Defendant Cuyahoga County participated in the facility review with the federal team and continued investigating after the Marshals Report. In early 2019, it issued its own report saying it "strongly concurs with the U.S. Marshals findings." The County's Inspector General reported that its "investigation revealed a fundamental failure of leadership, management[,] and oversight" and that "[t]o the extent that CCCC has written policies, the CCCC management and leadership has failed to adequately disseminate those policies or train staff."

6.      The Inspector General identified numerous "systemic failings" and concluded that "County leadership failed to adequately supervise, manage, and operate the CCCC." The Inspector General was particularly critical of county executive Defendant Armond Budish's decisions to hire Kenneth Mills as director of regional corrections when Mills "had no previous jail management experience" and of Mills's authorization "to circumvent the formal chain of command and the oversight" of then-Sheriff Clifford Pinkney. The Inspector General also found that there was "a culture of perceived retaliation that impeded the open and honest discussion" of the jail's failings.

7.      Mr. Nelson was injured because of the judgment or discretion that a Cuyahoga County official exercised to punish a pre-trial detainee who placed his arm through a tiny food chute in his cell door.

8.      Those at every level of County government share responsibility for the attack that Mr. Nelson endured. From the county executive (who refused to heed warnings about mismanagement of the jail) to the line corrections staff (who abused him without justification), there is plenty of blame to go around.

**PARTIES**

9.      Plaintiff Gregory Nelson is a resident of Cuyahoga County. He is an African-American man. At all times relevant, Mr. Nelson was held in the Cuyahoga County Corrections Center ("the county jail" or "the jail").

10.     Defendant Cuyahoga County is an Ohio political subdivision responsible for the jail.

11.     Defendant Armond Budish is the Cuyahoga County Executive. At all times relevant, he was responsible for the jail's operation and acting under color of state law.

12.     Defendant Eric Ivey is the former warden of the Cuyahoga County Corrections Center. At all times relevant, he was responsible for the jail's operation and acting under color of state law.

13.     Defendant Gregory Croucher is the former warden of the Cuyahoga County Corrections Center. At all times relevant, he was responsible for the jail's operation and acting under color of state law.

14.     Defendant Jermaine Clements is a corrections officer with the jail. At all times relevant he was in uniform and acting under color of state law.

## JURISDICTION AND VENUE

15.     The Court has jurisdiction because this action concerns state-law violations by Defendants, and the amount in controversy exceeds $15,000.

16.     The suit concerns civil liability for acts that occurred in this county.

17.     Venue is proper here because the events at issue took place in this county.

## FACTUAL BACKGROUND

**For years, Cuyahoga County has been operating a violent and abusive jail, failing to ensure that the facility is adequate and safe and that corrections personnel are trained to respect the constitutional rights of those in custody.**

18.     For years, Defendant Budish worked to regionalize the County's jail system—urging local communities throughout the County to incarcerate prisoners at a County facility and pay the County for this privilege.

19.     In his February 9, 2015 press release announcing Mills's appointment as the director of regional corrections, Defendant Budish represented that Mills would "oversee both our County Jail and collaborations among regional jails." The press release continued:

> As Regional Director of Corrections, Mills will oversee emerging collaborations and potential consolidations with jails county-wide. He will also direct the operations of the Sheriff's Department County Jail after a long-term transition with the current, part-time County Jail Wardens. The Regional Director of Corrections position will become a self-sustaining position, with its salary offset over time by the revenue generated from jail regionalization. As Regional Director of Corrections, Mills will also ensure compliance with departmental policy and standards and assist with developing and managing the budget, among other responsibilities.

20.     Pinkney publicly endorsed Defendant Budish's selection of Mills for this important and complex position, saying, "Ken Mills has been a capable leader and effective public servant during his time here in Cuyahoga County." Pinkney described Mills as having "the right background and experience to successfully manage the County Jail and usher in a new age of collaboration in county-wide corrections."

21.     Budish's press release said Pinkney was to "supervise Mills in the Sheriff's Department."

22.     Defendant Budish crammed more people into the jail facilities despite terrible overcrowding and a lack of adequate facilities, staff, training, medical care, and other resources. Due to this effort, many people's civil rights were violated through punitive violence, inadequate medical care, and generally unhygienic and depraved conditions. Plaintiff Nelson was among the many victims of this terrible, but avoidable, nightmare.

23.     The county jail has a maximum capacity of 1,765 detainees. For years, the jail violated state standards as to its total population. From 2012–18, the jail was overcrowded by hundreds of inmates every day. And that overcrowding reached peak frenzy under Mills' tenure. In 2012, the jail population was 2,005 people on average. By 2018, it was 2,357.

24.     As Mills was driving up the inmate population with the support and approval of County administration, he was driving down the staff numbers. In 2015, 33 officers separated from their positions. In 2016, that number rose to 42. It rose again in 2017 to 57. And in 2018, 72 corrections officers left their positions. By the time Mills resigned in late 2018, the total corrections officers employed at the downtown jail was the lowest number for staffing at that location in the preceding three years. Yet Mills had no comprehensive staffing plan to address the slew of vacancies.

25.     The understaffing that Mills and his team created led to call-offs by corrections staff reaching massive levels: as many as 40% of corrections officers would be absent from work in a week. The Ohio Patrolmen's Benevolent Association, which represents the corrections officers,

attributes the high level of call-offs to the staff's dislike of mandatory hold-overs and the belief that management unfairly denies their grievances and complaints. Before Mills's tenure, overtime was voluntary. But after Defendant Budish appointed Mills, that changed. He removed the off-day volunteer list to reduce overtime. Faced with understaffing and high call-offs, Defendant Budish allowed Mills to refuse to fully staff or pay the costs of overtime and instead opt to entrench these dangerous practices by frequent "red-zoning" (where inmates are locked in their cells for 23 or more hours a day—essentially solitary confinement for everyone in custody).

26.     The deliberate overcrowding and understaffing resulted in chronic red-zoning, with one corrections officer responsible for simultaneously protecting detainees in up to four separate housing pods. Extended confinement in cramped quarters can increase tensions and lead to aggressive behaviors, psychological breakdowns, and physical illness. Red-zoning leads to higher levels of stress and disruptions for inmates and leads to high turnover, low morale, and increased absenteeism for staff.

27.     After Defendant Budish appointed Mills, medical care suffered in the facility. Inmates with health conditions were frequently not seen and inmates' grievances about lack of medical treatment were regularly ignored or dismissed. Mills moved the medical screenings out of the intake area, making it harder for medical staff to determine who needs what care.

28.     The jail staff, under Mills's leadership, used food as punishment, providing "sweat meat," bologna sandwiches, rotten carrots, and spoiled milk—even ordering food past its expiration date to save money. During Mills's tenure, the average cost per meal declined from $.83 to $.64. During that same time frame, the State of Ohio spent $1.58 per meal per prisoner.

29.     Failing to provide minimally adequate nutrition was another indignity that Cuyahoga County's detainees faced in custody. Other indignities included being denied access to toilet paper and living in filthy, squalid conditions surrounded by mold, bugs, stains, and water leaks.

30.     Under Mills and Defendant Ivey, there was significant and widespread belief among corrections officers that jail management retaliated against employees who report malfeasance, misconduct, or mistakes, labeling those employees "disgruntled." And corrections officers retaliated against inmates who complained. Defendant Budish did not remedy this criminal mismanagement of the jail system.

31.     Defendant Budish failed to institute adequate policies to prevent or redress inhumane jail conditions.

32.     In running a facility where punitive, unjustified violence was accepted and reinforced, Defendant Budish bears significant responsibility for the abuse that Mr. Nelson endured at the jail, as described below.

### Mr. Gregory Nelson and Defendant Jermaine Clements chat through Mr. Nelson's closed, metal cell door.

33.     Mr. Nelson was indicted on December 17, 2019 and committed to the Cuyahoga County Correction Center.

34.     That day, he was placed in a cell in Pod 10A with urine and feces in it.

35.     Mr. Nelson complained about the unsanitary conditions at the jail to Defendant Jermaine Clements, who was working in his pod.

36.     Mr. Nelson asked to be permitted to clean the cell, but Defendant Clements refused. He told Mr. Nelson he would have to wait in the cell, despite the obvious health risks associated with sitting in a room filled with urine and feces.

37.     When detainees disagree with the directives or decisions of a corrections officer, Cuyahoga County Corrections Center policies direct them to ask for a corporal to evaluate the situation. By policy, the corrections officer is then supposed to summon the corporal.

38.     Consistent with policy, Mr. Nelson asked Defendant Clements to summon a corporal so he could again ask for permission to restore his cell to the bare minimum level of sanitation for occupation by a human being.

39.     Inconsistent with policy, Defendant Clements refused.

40.     Defendant Clements began serving lunch instead.

41.     As he neared Mr. Nelson's cell, Defendant Clements said Mr. Nelson would get fed "just like everybody else."

42.     Mr. Nelson was not fed "like everybody else." Instead, Defendant Clements assaulted him.

43.     To attract the attention of a corporal, Mr. Nelson stuck his hand through the food chute in his door and left it there. Like covering the window to a cell with paper, it is one of many actions that is supposed to require a corrections officer to immediately summon a corporal.

44.     This is one of many nonviolent, nonverbal cues detainees at the jail have learned to use to summon a corporal when a corrections officer refuses to comply with policy.

45.     Still, Defendant Clements refused to call a corporal. Defendant Clements yelled at Mr. Nelson to move his hand and then immediately began stomping it with his boot, trying to crush it against the cell door and metal food chute.

46.     With Mr. Nelson's arm dangling out of the food chute after two hard kicks, Defendant Clements did nothing to check for or tend to Mr. Nelson's injuries.

47.     Defendant Clements again told Mr. Nelson to move his hand but immediately kicked it again. Mr. Nelson began moving his arm within seconds, but Defendant Clements continued kicking him.

48.     In the space of ten seconds, Defendant Clements stomped Mr. Nelson's arm and hand five separate times. Despite Mr. Nelson's complaint that his arm was broken and that he needed to see a doctor, Defendant Clements did nothing to check for injuries, let alone treat them.

**Defendant Clements calls for backup and lies to his commanding officer
about assaulting Mr. Nelson.**

49.     After taking punishment into his own hands (and feet) five different times, Defendant

Clements finally called for his supervisor.

50.     Soon after, two Special Response Team ("SRT") officers and Cpl. Randy Pritchett arrived at

Mr. Nelson's cell door. All three officers had their body-worn cameras activated.

51.     When the corporal asked what happened, Defendant Clements immediately began working

out a story to cover up the attack.

52.     First, he told the corporal that he tried to use his leg to "push" Mr. Nelson's arm through

the chute.

53.     Defendant Clements's account of his attack on Mr. Nelson was false.

54.     But when the corporal had him start his story over just seconds later, Defendant Clements

concocted an even gentler version for his second attempt, saying he used the open palm of his hand

to try to push Mr. Nelson's arm back through the chute.

55.     Defendant Clements's second account of his attack on Mr. Nelson was false.

56.     Defendant Clements never disclosed that he had repeatedly stomped on Mr. Nelson's arm,

nor that he had given Mr. Nelson less than three seconds' warning to squeeze his arm back through

the chute before Defendant began his attack.

57.     He never tried to push the arm in with his leg or an "open palm."

**SRT Pritchett speaks to Mr. Nelson to get his statement of events, which is
evidenced by Defendant Clements' own body-worn camera.**

58.     After Defendant Clements left the area, Mr. Nelson told Cpl. Pritchett that he and

Defendant Clements had been arguing over Mr. Nelson's complaint that he was left in a cell with

urine and feces in it. He wanted to clean it, but Defendant Clements told Mr. Nelson he would have

to wait.

59.     Mr. Nelson told Cpl. Pritchett that although he asked Defendant Clements to speak to a corporal about the disagreement—as jail policies direct him to do—Defendant Clements refused. Instead, he said, Defendant Clements started kicking him.

60.     Cpl. Pritchett said he would review the video footage and escorted Mr. Nelson to the medical pod. Despite Mr. Nelson's complaint that he had suffered broken bones, he received minimal treatment. He continues to suffer from pain in his hand to this day, but the County has not had him evaluated for nerve damage, and it only occasionally provides him with any kind of medication to treat the pain.

### As supervisors investigate, Defendant Clements cycles through still more versions of his story before confessing to his attack on Mr. Nelson.

61.     Later that day, Defendant Clements wrote a letter to HR with the subject "work injury," offering a third version of events by claiming that Mr. Nelson was pulling him through the food chute by the hand.

62.     Defendant Clements's third account of his attack on Mr. Nelson was false.

63.     In his incident report about the attack on Mr. Nelson, Defendant Clements embellished his latest version of events, claiming that Mr. Nelson grabbed his arm through the chute. This allegation was untrue. According to Defendant Clements:

> "[Mr. Nelson] grabbed my right hand and pulled it through the chute hitting my hand on the inside of the chute as well as the chute door falling on the top of my hand when I pulled it back from inmate Nelson. Once I got my hand free I reopened the chute with my left hand and so inmate Nelson could put his arm back through the chute, because he had stuck his entire right arm out of the cell chute."

64.     Defendant Clements's fourth account of his attack on Mr. Nelson was false.

65.     During a January 14, 2020 investigatory interview, Defendant Clements embellished further, claiming he needed to be hospitalized after the attack. When investigator Sgt. Branch asked Defendant Clements if anything occurred when he served Mr. Nelson his food tray through the

food chute, Defendant Clements responded, "Yes Nelson grabbed his food try and grabbed my hand injuring my hand, where I had to be sent out to Metro Hospital for care."

66.　　Asked why he stomped Mr. Nelson's arm, Defendant Clements responded, "I felt he was still a threat to me. I gave him verbal commands to put his hand back in the chute while giving him strikes I think I gave him at least two to three commands. Had he grabbed me he could have pulled me to the door."

67.　　Defendant Clements's fifth account of his attack on Mr. Nelson was false.

68.　　During his March 4, 2020 pre-disciplinary conference, Defendant Clements stuck with this latest version of the events and, again, claimed that Mr. Nelson grabbed his arm. Again, this allegation was untrue.

69.　　Defendant Clements's sixth account of his attack on Mr. Nelson was false.

70.　　Mr. Nelson did not grab Defendant Clements, nor could he have pulled him through the roughly 4-inch-tall food chute.

71.　　Defendant Clements's lies were an attempt to cover up his conduct and mislead the supervising officer into believing that Defendant Clements followed procedure.

72.　　Although Mr. Nelson had done nothing wrong, he was beaten by a government employee assigned to protect him, and then assigned to solitary confinement "pending investigation." However, Defendant Clements was not disciplined pending investigation.

73.　　Mr. Nelson was not removed from solitary confinement until September 2020.

74.　　Although Defendant Clements had attacked one of his charges and repeatedly lied to cover it up, he was permitted to continue working, collecting thousands of dollars and valuable benefits.

75.　　Based on the County's history of acquiescence to such misconduct, Defendant Clements expected that he could attack Mr. Nelson with impunity.

76.     Defendant Clements's false reports to his supervising officer about his attack on Mr.

Nelson— in his incident report, during his investigatory interview, and during his pre-disciplinary

conference—are consistent with Defendant Cuyahoga County's custom, policy, pattern, and practice

of enabling its officers to target inmates with retaliatory violence for perceived or imagined insults.

77.     Defendant Clements filed these materially false reports with the intention of influencing one

or more public officials in the discharge of their duties, including to encourage unwarranted

discipline against Mr. Nelson following the attack he endured at the hands of corrections staff for no

reason.

**Defendant Clements attends a pre-disciplinary conference, regarding his December 17, 2019 assault on Mr. Nelson, and the findings directly refute all of Defendant's versions of events**

78.     After reviewing all of the available video, Assistant Warden P. Christopher concluded that

Defendant Clements's use of force was "excessive and unnecessary."

79.     After conducting an investigatory interview with Defendant Clements and reviewing the

available video, Sergeant Branch concluded that Mr. Nelson had not grabbed Defendant Clements

and injured him:

> "The video/audio captured did not indicate the officer was grabbed. In fact, when asked what happened by responding personnel, (Officer Toth and Cpl. Pritchett), Officer Clements makes no mention that he was grabbed and injured by the inmate. Officer Clements then continued to serve the remainder of the inmates in the pod."

80.     On the contrary, Sgt. Branch concluded it was Defendant Clements who had attacked Mr.

Nelson by "deliberately pushing down on the food chute's flap, pinning the inmate's hand in the

food chute."

81.     Sgt. Branch concluded that "Officer Clements was in no immediate threat at the time he was

kicking the inmate's arm."

82.     Confronted with his supervisors' findings, Defendant Clements said his "first reaction was to kick at the inmate's arm."

83.     Kicking the people who you are supposed to protect and who pose no threat to you is not the first reaction of properly trained corrections officer.

84.     Official policies required Defendant Clements to request the help of other officers rather than attacking Mr. Nelson for sticking his hand out the chute. Defendant Clements sought to justify his refusal to do so by saying he wanted to "get his bearings and wits about him" and "step away" from Mr. Nelson's cell.

85.     There was no need for Defendant Clements to "step away" from Mr. Nelson to get his "bearings." Mr. Nelson was secured behind a closed metal cell door and posed no threat to him.

**Defendant Clements is suspended for 15 days for his assault on Mr. Nelson**

86.     The County found that Defendant Clements violated Rule #70 (any other act or failure to act which constitutes incompetency, inefficiency, dishonest, immoral conduct, insubordination, discourteous of the public, failure of good behavior or other misfeasance, malfeasance or nonfeasance in office) and Rule #81 (unnecessary physical contact with a jail inmate).

87.     On May 14, 2020, the County purported to suspend Defendant Clements for 15 days for attacking Mr. Nelson. Instead, it cooked the books so Defendant Clements missed only 10 days of work.

88.     Defendant Cuyahoga County did not discipline Defendant Clements for his materially false verbal or written reports regarding his December 17, 2019 assault on Mr. Nelson.

89.     The County did not discipline Defendant Clements for lying about that attack or his false reports regarding his December 17, 2019 assault on Mr. Nelson.

**Law enforcement investigates Defendant Clements and concludes he committed at least four crimes.**

90.     Word of the attack on Mr. Nelson eventually reached the press. On July 22, 2020, Cleveland.com reported the County was refusing to release records related to an incident in which Defendant Clements was accused of "repeatedly stomping and kicking an inmate's arm through a food chute."

91.     Days later, prosecutors charged Defendant Clements with assault.

92.     They later amended those charges to add counts for falsification, interfering with civil rights, and dereliction of duty.

93.     Those charges are still pending.

94.     Defendant Clements assaulted Mr. Nelson, yet he alleged that Mr. Nelson assaulted him. Defendant Clements knew each time that he made that allegation that it was false.

95.     In an investigatory report, Deputy Kevin Harvey wrote that he had received a report that "Clements was injured while attempting to feed Inmate Gregory Nelson," but "upon further review of the Body Cam video, Officer Clements may have in fact assaulted Inmate Nelson."

**Mr. Nelson's treatment was consistent with the County's choice to permit a jail culture that desensitizes staff to violence and incentivizes their abuse of inmates.**

96.     The consistent understaffing, low pay, and deplorable work and confinement conditions at the Cuyahoga County jail set corrections officers up to fail.

97.     The Cuyahoga County jail has a custom, policy, pattern, and practice of physically punishing incarcerated citizens without just cause to use force.

98.     The instinct of a jail employee to abuse Mr. Nelson is consistent with the County's custom, policy, pattern, and practice of promoting a culture in which employees are desensitized to violence against the inmates in their custody and to falsifying reports because of the jail's history of promoting officers who exact unlawful assaults on those currently incarcerated.

99.     Mr. Nelson did not deserve the treatment he endured.

100.    Since suffering abuse at the hands of Defendant Clements, Mr. Nelson has experienced

mental and emotional damages. The memories of these traumatic events continue to affect his

mental health and emotional state.

101.    Defendant Clements's attack on Mr. Nelson suggests such violence is a standard occurrence

in this facility.

102.    Cuyahoga County wantonly, willfully, recklessly, maliciously, and in bad faith cultivates,

perpetuates, and encourages a culture of punitive abuse including customs, policies, patterns, and

practices of using excessive force and generally failing to train staff on how to act consistent with

constitutional requirements or common decency. Even in cases like this, where video evidence

proves that officers have attacked detainees and then lied to cover it up, the County permits them to

return to work, free to attack again.

103.    Defendant Cuyahoga County and Defendant Budish ignored or soft-pedaled ferocious acts

of violence by corrections personnel, thus creating a thriving culture in which unprovoked and

excessive violence was commonplace.

**The United States Marshals Service investigates the jail and finds inhumane
and brutal conditions including use of excessive force and failure to train.**

104.    In late 2018, a team led by the United States Marshals Service investigated jail conditions and

issued a comprehensive report.

105.    The team that conducted the investigation leading to that report included six U.S. Marshals

personnel, seven subject-matter experts, three FBI representatives, and staff from the Cuyahoga

County Agency of the Inspector General (AIG).

106.    In a statement released November 8, 2018, then-Chief of Staff Earl Leiken to County

Executive Budish described the team reviewing the jail as "a team of highly experienced assessors."

107.    The resulting report—the Quality Assurance Review of the Cuyahoga County Corrections

Center ("the Marshals Report") (attached as Ex. 1)—identified these (and other) deficiencies:

a.    "Review of Use of Force (UOF) incidents determined staff are not utilizing all tools and techniques generally accepted as best practices for UOF teams to ensure staff and detainee safety (i.e., confrontation avoidance, UOF team concept, team briefings and debriefings, removing staff involved at the on-set of the incident from the immediate area, and a review of all UOF incidents by the agency administrator or designee, and medical assessment of all involved). Additionally, video tapes involving UOF are not tagged and labeled as evidence. Written reports are not required from all persons involved in the use of force or any staff who played a role in the incident (i.e., medical, correctional personnel, SRT, etc.)." *Id.* at 35.

b.    "Over 100 detainee/inmate interviews reveal strong and consistent allegation of brutality, UOF punishment, and cruel treatment at the hands of Security Response Team (SRT), whom the detainee/inmates refer to as "The Men in Black," based on their black para-military uniforms." *Id.*

c.    "During the review, review team members observed SRT members verbally abusing and demonstrating aggressive behavior towards detainees/inmates; review of multiple UOF and SRT body-cam video reveal and contain aggressive conduct and behavior as well as abusive, explicit language used by SRT members directed at detainees/inmates." *Id.*

d.    "SRT members who were escorting detainee/inmates to be interviewed by Facility Review Team members were referring to requested detainee/inmates as "Snitches," as they escorted them to and from the interview location. The threatening, intimidating and aggressive behavior demonstrated and witnessed by the Facility Review Team resulted in the request to remove up to 10 detainee/inmates from the CCCC, for fear of SRT members retaliation, and the legitimate fear of detainee/inmate safety." *Id.*

e.    "Denial of detainees/inmates to perform hygiene, detainees/inmates are not allowed access to showers, telephones and recreation due to CCCC's implementation of a lockdown system known as "Red Zone." The "Red Zone" RHU detainees/inmates management system is used as a means to address insufficient staff and staffing shortages. Detainees/inmates housed in the "Red Zone" RHU are locked down for periods of 27 or more hours in their cells, additionally interviews with detainees/inmates in the "Red Zone" RHU are lockdown, along with inspection of their cells reveal the absence of toothbrushes, toothpaste, toilet paper and denied access to razors or barbering." *Id.* at 4.

f.    "There is no internal quality control plan in place to provide an annual review of CCCC's operations to ensure compliance to ensure compliance with CCCC's policies and procedures. CCCC is inspected annually by the Ohio Department of Rehabilitation and Corrections' Bureau of Adult Detention to determine compliance with the Ohio's Minimum Standards for Adult Detention Centers. The last inspection was on November 14, 2017; review of the November 14, 2017 previous

inspection documentation reveal CCCC's staff did not comply, address or provide corrective actions for identified deficiencies which included: exceeding rated capacity, lack of natural lighting in housing units, and detainees/inmates not being provided with five hours a week of exercise. A corrective action plan to address the aforementioned identified deficiencies was not provided for review." *Id.* at 26.

g.    "Sheriff's Deputies provide transportation and outside escort for detainees/inmates. Therefore, Correctional Officers do not carry firearms, nor do they receive specialized firearms training. Staff authorized to use chemical agents receive required training. A review of management and supervisory staff training files reveal management and supervisory staff receive 40 hours of management and supervisory training during their first year and only 8 hours annually as required by the Ohio Minimum Adult Detention Standards. FPBDS requires management and supervisory staff receive an initial 40 hours training the first year and 24 hours thereafter." *Id.* at 28-29.

h.    "There is no policy in place requiring notification to the agency of jurisdiction of serious incidents involving detainees/inmates. Additionally, no documentation was provided for review to support the practice of external agency notifications." *Id.* at 29.

i.    "Interview with staff reveal numerous staff at all levels express concerns for their safety and security due to staffing shortages; concerns were also expressed regarding morale and sense of inability to make changes or voice concerns to leadership or management." *Id.* at 29.

108.    The Marshals Report's conclusions were accurate.

109.    The toxic culture and abuse of power that led jail staff to intimidate witnesses in front of the

U.S. Marshals is the same culture that emboldened Defendant Clements to attack Mr. Nelson,

knowing that his job would remain secure.

**The Inspector General endorses the Marshals Report's findings, makes
additional findings regarding the failures that led to the jail crisis, and refers
the matter to the Ohio Attorney General's Office for prosecution.**

110.    The Cuyahoga County Inspector General is "the County's chief ethics officer." Charter, Art.

XV, § 15.01(1).

111.    The Inspector General has the authority to investigate "possible ethical violations in the

conduct of County business" and any "fraud, corruption, waste, abuse, misfeasance, malfeasance

and nonfeasance." Such investigations must be conducted "without interference or pressure" from other public officials or employees.[1]

112.    Defendant Budish appointed Inspector General Mark Griffin in 2015. Mr. Griffin may be removed only for cause by resolution of County Council with eight members voting to remove.[2]

113.    After the U.S. Marshals concluded their review, the Inspector General reviewed issues that the Marshals had not already investigated and issued a report—Cuyahoga County Corrections Center Report of Investigation (attached as Ex. 2).[3]

114.    In its 80-page report dated February 12, 2019, the Cuyahoga County Inspector General detailed how his office had "initiated an investigation into the conditions of the County Jail" in September 2018 following four deaths at the facility. The report describes how the Cuyahoga County Inspector General "participated in the inspection conducted by the federal team" that produced the Marshals Report. The Inspector General stated that "[t]he professionalism of the U.S. Marshals Service cannot be overstated. They are outstanding."

115.    The Cuyahoga County Inspector General described the U.S. Marshals Service's investigation: "Eleven jail management experts undertook a detailed and specific examination as to whether the CCCC complied with federal standards for federal detainees."

116.    The Cuyahoga County Inspector General continued: "The U.S. Marshals Service, in a 52-page report issued November 21, [2018,] concluded that the CCCC failed numerous standards and identified 24 of 55 criteria in which the CCCC was rated either 'unsatisfactory' or 'marginal.'"

---

[1] *Id.* at § 15.01(2); Cuyahoga County Code § 204.01(B)(3).

[2] Cuyahoga County Charter § 15.01(5).

[3] Mr. Nelson's attorney obtained the attached report by the Cuyahoga County Inspector General from the Ohio Attorney General's Office via public-records request. The redactions in the exhibit were present when his attorney received it.

117.    The Cuyahoga County Inspector General then admitted that it "strongly concurs with the U.S. Marshals findings" and was in "agreement with the findings of the federal subject matter experts."

118.    The Inspector General expressly admitted that **"[t]o the extent that CCCC has written policies, the CCCC management and leadership has failed to adequately disseminate those policies or train staff."** (Emphasis added.) The Inspector General attributed the jail's problems to "a fundamental failure of leadership, management and oversight."

119.    The Inspector General summarized Mills's hiring and performance:

> In 2015, the County appointed a Regional Director of Corrections who had no previous jail management experience. The Regional Director was allowed at times to circumvent the formal chain of command and the oversight of the County Sheriff. Within the CCCC leadership, despite objective evidence of unexplained deaths, increased staff turnover[,] and high rates of staff absenteeism, there was sentiment that any problems were overstated or were caused by external factors and that the jail itself was well-run. This disconnected reasoning was reinforced by a culture of perceived retaliation that impeded the open and honest discussion of failings in the CCCC.

120.    The Inspector General continued: "The simultaneous overcrowding, understaffing and 'red-zoning' of the CCCC are equal parts symptoms and causes of the systemic failings. Every year since 2012, the CCCC's average daily prisoner population exceeded the level permitted by its certification. Rather than correct this problem, the CCCC increased its overcrowded population by 18%. It is both commendable and evidence of past management failures, that after the federal report, the County was able to reduce its average daily population by nearly 20% within two months."

121.    The Inspector General further found that as of February 12, 2019, the jail was still "below the authorized staffing levels for corrections officers. ('COs'). CO turnover increased 118% between 2015 and 2018. It is not unusual for 40% of COs to 'call off' for their shifts. As a result of these staff shortages, and a change in the overtime policy, many COs are required to work 16 hour shifts and

detainees are 'red-zoned'—a process that requires a single CO to lock down and monitor multiple prisoner pods. Red-zoning increases the stress on COs as well as on detainees."

122.    The Inspector General also reported that "[d]eficiencies were found in the provision of medical services. Medical staff reported that inmates were unable to receive necessary medical care in a timely fashion. At times, requests for medical care were allegedly delayed, ignored or deleted from the case tracking system without receiving care. Because of a change in CO staffing, medical personnel can be stymied from providing care due to a lack of sufficient COs assigned to the medical center."

123.    The Inspector General's report continued: "The AIG also found a failure of oversight. At its core, the primary responsibility for correcting management problems lies with management itself. The wardens, Regional Jail Director and those who supervise them – or are supposed to supervise them – are responsible for managing the jails."

124.    The Inspector General admitted that the County violated federal standards as laid out in the Marshals Report and admitted that those same failings violated parallel state-law requirements: "The AIG concurs with the findings of the U.S. Marshal, including findings regarding violations of federal standards. These violations mirror violations of the equivalent Ohio Jail State Minimums in most cases. Rather than repeat those findings, the AIG globally recommends that each violation be rectified."

125.    The Inspector General made these recommendations regarding management and leadership at the jail: "1. Establish and maintain a clear chain of command from COs to the Warden to the Regional Jail Director, to the County Sheriff and the County Executive; 2. Empower the County Sheriff with effective primary responsibility, institutional support and authority regarding the operations of the Regional Jail System. 3. Hire qualified leadership with extensive experience in managing of system of correctional facilities."

126.     As for staffing, the Inspector General recommended that the jail "[s]ignificantly increase the number of CCCC staff in order to minimize red-zoning, improve safety and security, improve morale, and reduce inmate incidents…[and] [w]ork to create a culture of respect between all levels of CCCC employees."

127.     The Inspector General found that "County leadership failed to adequately supervise, manage, and operate the CCCC. Despite years of overcrowding, the CCCC increased the average daily inmate population while reducing staff. At the same time, CO turnover increased 118% and weekly call-offs averaged approximately 40%. This led to increased double-, triple[-] or even quadruple[-]podding. The County's ability to identify and correct problems was worsened by a culture of contempt towards COs, fear of retaliation by whistleblowers, and a system that fails to address complaints in an effective manner. Oversight was inadequate at nearly every level — from the line managers, to the County, to the State. As set forth in the recommendations above, the County should increase the quantity and quality of staff by, among other things, hiring professional leaders with experience in jail management, filling staff to authorized levels and working to change the culture that has damaged morale, affected call-offs, and discouraged staff from correcting problems within the CCCC."

128.     The Inspector General questioned Defendant Budish's decision to appoint Mills, who was unqualified to lead the jails: "Leading a regional system of correctional facilities requires skills and experience that are both profoundly deep and extremely specialized. These are extremely complicated and important jobs that require tremendous skills and a legacy of practical experience. 'To become a prison warden, you must first start as a correctional officer to gain experience and familiarize yourself with the workings of a correctional facility… With vast experience and an advanced degree, you can become the head of prisons in your county or state.' To become a successful leader of correctional facilities, you should have:

- A detailed knowledge of administration of correctional facilities
- A good understanding of human behavior and psychology
- Strong administrative and leadership skills
- Strong problem-solving skills
- The ability to work with people from diverse backgrounds
- An intricate understanding of prisoners' rights
- An awareness of safety and health issues in correctional facilities"

129.    But Mills had none of those things and acted accordingly, as Defendant Budish should have

expected, as he was aware of Mills's lack of qualifications for the position.

130.    Defendant Budish should have heeded the warnings of other County employees and leaders

who raised concerns about Defendant Mills's behavior, including declaring that Mills should be

fired.

131.    The Inspector General found that "management ignored objective data" and that "Mills

reorganized the CCCC and appointed direct reports who served in their positions at his will. By the

end of September 2018, six detainees had died in the CCCC, staff turnover had increased 118%[,]

and absenteeism by COs was frequently at 40% or higher."

132.    One way that jail management was deliberately indifferent to the constitutional rights of

those in custody was by chronically understaffing the overcrowded facility and then mistreating

those officers who didn't quit or call off. According to the Inspector General, "corrections work is

one of the most stressful in law enforcement. Officers must remain continually alert during eight-

to[-]16-hour shifts to avoid being attacked or killed by the offenders that they supervise. The

intensity of these environments often prompts officers to shut down emotionally, reducing their

ability to function effectively within the institution."

133.    The Inspector General also concluded that there was "a break down in the management

process with regards to cleanliness of the jail."

134.    Cuyahoga County Code § 204.01(B)(3)(d) provides that "If an [AIG] investigation reveals

reasonable grounds to believe that a violation of any state, federal, or local law, rule, regulation, or

policy has taken place, the Inspector General shall notify the appropriate civil, criminal, or administrative agencies in charge with enforcement of said violation."

135.    On April 25, 2019, Defendant Cuyahoga County's Inspector General sent a memorandum (attached as Ex. 3) and other materials to the Ohio Attorney General's Office to refer the matter for prosecution.

**Even after the Marshals Report, the jail's culture celebrates gratuitous and punitive violence against inmates, in particular the use of restraint chairs and pepper spray, and continues to recklessly disregard the safety of those in custody.**

136.    The casual resort to violence—in particular the use of pepper spray or OC foam—is something the corrections officers at the jail find so unremarkable and amusing that they joke about it on social media.

137.    On January 7, 2019, Darriell Hayes was a corrections officer at the jail.[4] Hayes shared a Facebook post with a video of a "Scared Straight" style program. The thumbnail image shows a young boy approximately five years old in prison garb and looking terrified. The post included the question, "An intervention program exposing kids to jail is raising questions for some. Do you think it goes too far?"

138.    Katie Spragg, also a corrections officer at the jail, posted a public comment sharing her view (misspellings in original): "maybe im crazy but i dont think its enough they need a chair and pepper spray."

139.    Hayes's Facebook post, with Spragg's comment, is below:

---

[4] Hayes is a defendant in a civil-rights lawsuit filed by former inmate Glenn Mayer, Jr. regarding Hayes's use of excessive force. The facts of that matter are described later in this complaint.



140.     On March 4, 2019, Hayes posted the following image saying, "I WILL NOW REFER TO PEPPER SPRAY AS PEOPLE SEASONING IN MY REPORTS."



141.    Photographs of Hayes—including a selfie in his corrections-officer uniform—are visible in the screenshots from his public Facebook postings alongside the images he shared with the world.

142.    Hayes remained a corrections officer at the jail until he resigned in August 2019. Spragg on also remained the job.

143.    These examples of corrections officers' social-media presence shed light on the toxic culture in which they work. It takes a special depth of depravity to joke about tying down and pepper spraying a kindergartener. And that established and ingrained depravity was on display when Defendant Clements attacked Mr. Nelson.

144.     Sheriff David Shilling has made repeated admissions about the problems at the jail and the need to change the violent and abusive culture characterized by employees like Defendant Clements who abuse inmates.

145.     Defendant Budish continues to act with reckless disregard for inmates' safety by hiring and retaining senior administrators who lack regard for the health and safety of the population they are entrusted to safeguard. Defendant Budish hired Gregory Croucher as the new jail warden after Defendant Ivey's demotion. Croucher resigned on April 2, 2020, approximately one month after the Cuyahoga County Sheriff and Inspector General commenced separate investigations into accusations that he (1) personally used excessive force against an inmate and (2) ordered an on-duty corrections officer to drive him to the airport. Thirteen days before he resigned, on March 20, 2020, Croucher reported for work at the jail after returning from a vacation to Costa Rica—without completing the County's mandatory COVID-19 screening protocol. He worked for four days before being sent him home to self-isolate on March 25, 2020. Croucher's blatantly reckless indifference to the life and health of jail inmates and personnel during a highly publicized pandemic exemplifies Defendant Budish's administrative hiring decisions and management as well as Cuyahoga County's broader custom, policy, pattern, and practice of endangering inmates.

### OTHER INCIDENTS RESULTING FROM THE MALICIOUS, BAD-FAITH, WANTON, AND RECKLESS EXERCISE OF DISCRETION AT THE COUNTY JAIL

146.     Besides the above-described attack on Mr. Nelson, corrections staff, as part of a custom, policy, pattern, and practice, have perpetrated many additional unprovoked and unwarranted acts of violence on the people incarcerated in the jail. Some of those acts are described below.

**A corrections officer attacked Lucille Dumas while she was confined to a restraint chair, breaking a Tupperware container over her head.**

147.    On January 14, 2015, Lucille Dumas was booked into the Euclid Jail—then operated by Defendant Cuyahoga County—after a traffic stop. During the booking process, Corporal Madeline Chappell punched Ms. Dumas in the face.

148.    When Ms. Dumas stood up to take a defensive posture, several officers threw her to the ground. One officer kicked her while she was on the ground, and Chappell sprayed her with pepper spray. An officer then lifted Ms. Dumas off the floor by her hair and threw her into a restraint chair.

149.    After the officers strapped Ms. Dumas into the chair, Corporal Chappell fixed her own hair and then punched Ms. Dumas in the face. Another officer rolled Ms. Dumas into an area out of sight of surveillance cameras, where Chappell beat her with a Tupperware container, using enough force to shatter the container.

150.    Corporal Chappell ordered officers to throw away evidence of her attack, delete information from their reports of the incident, and sign false statements about what happened.

151.    Before the attack on Ms. Dumas, Corporal Chappell had been disciplined dozens of times. She was only able to carry out her attack on Ms. Dumas because the County failed to properly discipline her for unprofessional conduct.

152.    The treatment Ms. Dumas endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

**Corrections staff pepper sprayed and restrained Chariell Glaze for asking about his release timing.**

153.    On November 27, 2017, Chariell Glaze was scheduled to be released from the jail. During the breakfast delivery, he asked the guard on duty to check on the status of his release paperwork, and the guard did not. The facility had been on red zone, where inmates are confined to their cells

for up to 23+ hours a day due to the jail's chronic understaffing. When the inmates were permitted to leave their cells later that morning, Mr. Glaze asked officer Deleonte Brown to check on the release paperwork. The pod was then again placed on red zone, which Mr. Glaze feared would delay his release. So he asked to speak to a corporal (consistent with the jail's standard practice that an incarcerated person has the right to request that a corporal respond to try to resolve an issue or concern with a corrections officer.)

154.    Corporal Damien Bodeker responded. Mr. Glaze showed him the journal entry confirming he was due to be released and asked Bodeker to check on the status. Mr. Glaze did not threaten himself or others, yet the corporal's response was, "I should dump you and spray you right now." Bodeker then grabbed Mr. Glaze by his shirt collar and emptied a can of pepper foam directly into his face from an unsafe distance. This use of force including pepper foam was consistent with the Defendant County's custom, policy, pattern, and practice of using force to retaliate against and abuse inmates indiscriminately.

155.    The following is a screen shot from the body-worn camera footage of the attack on Mr. Glaze. It shows Bodeker's gloved left hand gripping Mr. Glaze's shirt as the corporal's right hand

sprays the pepper foam into Mr. Glaze's face:



156.    Bodeker and Brown then walked Mr. Glaze into a metal door, resulting in a broken tooth and cuts to his face and lips, which were aggravated by the pepper spray.

157.    SRT officers arrived and roughly strapped Mr. Glaze into a restraint chair. SRT officers wear black paramilitary garb and are known in the jail for their proclivity for violence. After strapping him into the chair, SRT officers mocked Mr. Glaze as he gasped for air and endured the burning agony of the pepper foam. As he tried to get pepper spray out of his mouth by spitting onto his own lap (and not at any staff member), SRT officers yelled with laughter that they "got a spitter!" and pulled a spit mask over Mr. Glaze's face (further exacerbating his discomfort).

158.    After ineffectively decontaminating Mr. Glaze from the pepper foam, they refused to let him use the restroom, leaving him confined alone in a frigid isolation room crying, drenched in pepper foam and urine. He spent the next three days in a segregation cell without access to a shower, soap, clean clothing, or clean bedding. He spent another five days in disciplinary isolation before finally leaving the jail on December 7, 2017.

159.    Mr. Glaze requested public-records video footage of his incarceration, but the County's response was woefully incomplete. It provided just a single snippet of a portion of the attack captured on Bodeker's body-worn camera. It did not provide complete footage of the events preceding the attack, the attack itself, or its aftermath. It provided no video of his transport to decontamination or medical, or of his ineffective decontamination, or of the spit mask being yanked on to his head for no reason. It provided no surveillance video at all.

160.    On information and belief, the video showing a portion of the attack on Mr. Glaze was tampered with or altered by someone with access to the videos.

161.    No one was punished for hurting Mr. Glaze, ensuring that no one involved would be dissuaded from hurting other incarcerated citizens. On March 1, 2019, the Defendant County issued Corporal Bodeker, who is white, a written reprimand for making a racist remark about a supervisor; he called a black male sergeant a "monkey ass" in front of subordinates. A few months later, the County promoted him to sergeant, again confirming that those who indiscriminately abuse inmates need fear no discipline at the jail and instead can look forward to advancing through the ranks to leadership positions.

162.    No one was held accountable for the missing video footage.

163.    The treatment Mr. Glaze endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

164.    Failing to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse corrections staff are perpetrating at the jail.

### A corrections officer smashed Joshua Castleberry's teeth into his nose over a dispute about a bologna sandwich.

165.    On February 5, 2018, Joshua Castleberry was in the county jail. Following a dispute over a bologna sandwich, officer John Wilson pepper sprayed and then savagely smashed a handcuffed Mr. Castleberry's face into the floor so violently that his teeth were broken (with one tooth pushed all the way up into his nasal cavity). At least one other officer—Corporal Brandon Honaker— witnessed this attack but did not report it to law enforcement. Instead, Honaker also pepper sprayed Mr. Castleberry. Officers Wilson, Jozwiak, Honaker, Barthany, and Pritchett placed Mr. Castleberry in a restraint chair and jammed a mask over his broken face to conceal the assault from medical staff. The spit mask quickly became soaked in blood.

166.    Ken Mills was then the administrator of the jail. (As detailed above, Mills has since resigned and been indicted based on his jail-related conduct.) His officers refused to let nursing staff remove the mask to assess Mr. Castleberry's injuries, but a night nurse saw Mr. Castleberry and requested medical evaluation. The security supervisor refused, saying: "He wants to try and hit one of my officers — he can sit the fuck there for hours."

167.    The night nurse called the nursing supervisor — Gary Brack, R.N. — at home, reporting a serious medical emergency. Nurse Brack called the staff sergeant in charge and demanded a medical evaluation, but the Defendant County waited another half-hour before transporting Mr. Castleberry to medical. The mask was lifted, EMS was called, and Mr. Castleberry was transported to the hospital for surgery to remove the tooth from his nasal cavity and reconstruct his face.

168.    The next day at the monthly sheriff's meeting, Mills covered up the abuse. When asked about the incident, Mills stated: "I reviewed the situation and the officers used appropriate force to the threat of what the inmate was using." Medical Director Dr. Thomas Tallman asked to view the security footage, but Mills refused, saying: "I already reviewed it — nothing was done wrong." (Dr. Tallman has since been removed as the jail's medical director.)

169.    Then-Sheriff Clifford Pinkney stated that he would follow up with the incident, but when he went to review the footage, the security and body-camera footage had somehow "disappeared."

170.    Wilson was indicted for felonious assault in the second degree and misdemeanor charges of interfering with civil rights and unlawful restraint. Corporal Jason Jozwiak was charged with unlawful restraint and interfering with civil rights related to denying Mr. Castleberry medical care. Jozwiak was acquitted but the result was a hung jury on the charges against Wilson for felonious assault and interfering with civil rights. On February 19, 2020, Wilson pleaded guilty to a reduced charge of assault and was sentenced to probation. Despite his conviction, the County retained him as a jail employee.

171.    During the trial, FBI agent Dennis Timony testified that his investigation revealed evidence that jail videos had been tampered with through deletion and other means. That explains why there was no video of Wilson attacking Mr. Castleberry for the sheriff to review or the jury in the criminal case to see. And it reveals serious flaws in the County's security and records-management protocols.

172.    The jail held no one accountable for what happened to Mr. Castleberry.

173.    No one was held accountable for the missing video footage.

174.    The treatment Mr. Castleberry endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

175.    Failing to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records that document the abuse corrections staff are perpetrating at the jail.

### A corrections officer knocked out Rayshon Reed's teeth and strapped him into a restraint chair for not taking his marijuana-possession charge seriously enough.

176.    In May 2018, Rayshon Reed was booked into the county jail due to a traffic warrant.

177. During intake, C.O. Robert Marsh found what he believed to be a bag of marijuana in Mr. Reed's pocket. He told Mr. Reed that that discovery would result in additional charges.

178. When Mr. Reed laughed at Marsh and said he would be out of jail the same day, Marsh punched him in the face, fracturing and knocking out his teeth.

179. Mr. Reed requested video footage of his treatment at the jail. Despite the existence of dozens of videos of Mr. Reed, the jail released only one, showing Mr. Reed being wheeled away from a puddle of his blood on the ground.

180. No one was held accountable for the missing video footage.

181. The treatment Mr. Reed endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

182. Failing to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse corrections staff are perpetrating at the jail.

### Blanche Hill endured a 12-hour confinement to a restraint chair with no restroom access.

183. In July 2018, Blanche Hill was booked into the county jail.

184. With no legitimate reason to do so, jail staff confined Ms. Hill to a restraint chair for many hours and denied her food, water, and the opportunity to use the restroom facilities.

185. The jail held no one accountable.

186. Ms. Hill requested video footage of her ordeal. Other than a single 32-second snippet from a body-worn camera (showing her already confined to the restraint chair), the jail has produced no video—from wall-mounted surveillance or body-worn cameras—documenting what she endured or why she was restrained.

187. No one was held accountable for the missing video footage.

188.     The treatment Ms. Hill endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

189.     Failing to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse corrections staff are perpetrating at the jail.

**Corrections officers emptied a can of pepper spray in Chantelle Glass's face while she was confined in a restraint chair and refused to decontaminate her to prolong her agony.**

190.     Chantelle Glass was booked into the county jail on July 16, 2018 after police discovered a warrant stemming from an outstanding traffic ticket.

191.     Ms. Glass requested a phone call so that she could inform her family of her arrest and contact an attorney. The guards repeatedly refused Ms. Glass's request even though anyone who watches Law & Order knows that everyone under arrest is entitled to a phone call.

192.     When Ms. Glass persisted in her request after being placed in a holding cell, corrections officers threatened that if she did not stop, they would tie her down and "mace" her. Ms. Glass continued to request her phone call, and officers called Corporal Idris-Farid Clark.

193.     Corrections officer Robert Marsh retrieved a restraint chair. Video surveillance shows Clark remove his can of pepper spray from his tactical vest, shake it, and return it to his vest pocket before Ms. Glass was even brought out of her cell.

194.     Ms. Glass cooperated as officers escorted her out of her cell in handcuffs and strapped her into a restraint chair. As Marsh continued tightening the restraints, Clark again took out his pepper spray and again shook the canister.

195.     When Marsh reached between Ms. Glass's knees, she instinctually drew her legs together out of fear. She made no other movements. Ms. Glass—strapped into the restraint chair—could not pose any threat to the officers.

196.     Rather than step back when Ms. Glass flinched, Marsh stepped towards Ms. Glass and punched her in the head. She flailed in her restraints, trying in vain to protect herself.

197.     Cpl. Clark then stepped towards Ms. Glass to make good on his colleague's threat to "mace" her. He emptied the canister of pepper spray into Ms. Glass's face for over six seconds and from an unsafe distance. Ms. Glass tried to turn her head to avoid the spray, but Mr. Clark grabbed her hair to hold her head still while spraying the pepper spray inches from her eyes.

198.     Rather than providing Ms. Glass with prompt and adequate medical care, the officers wheeled her to a utility closet. Minutes passed before officers began "decontamination" by thrice spritzing Ms. Glass's face and the top of her head with water. This did not effectively decontaminate Ms. Glass (nor was it intended to). Pepper spray still covered her face, neck, and chest after the "decontamination" concluded.

199.     Clark then wheeled Ms. Glass to the medical unit. Having access to medical personnel did not improve matters given the medical staff's participation in the corrections officers' deliberate indifference to and apparent enjoyment of Ms. Glass's agony. The sole "medical care" provided by Nurse Diane Lessmann was dabbing Ms. Glass's eyes with one piece of gauze. This nurse did not explain to Ms. Glass what was happening to her and did not display any compassion for her pain.

200.     When Ms. Glass left the medical unit, pepper spray was still visible on her face, neck, and chest. Ms. Glass was placed alone in an isolation cell still restrained and covered in pepper spray for over two hours, and denied access to food, water, and the opportunity to use the restroom facilities.

201.    When Clark returned to release her after hours alone in the wait room, Ms. Glass asked

Clark: "Why did you mace me?" He responded: "Because you talk too much." He told her she

shouldn't have gotten "smart."

202.    For her entire 48-hour stay in the jail, corrections staff denied Ms. Glass's requests to

shower.

203.    For her entire 48-hour stay in the jail, Ms. Glass remained in the same clothing contaminated

with pepper spray and urine.

204.    Ms. Glass was released on July 18, 2018 after New Jersey officials confirmed that they did

not want her extradited on the old warrant.

205.    Ms. Glass has requested public-records video footage of her incarceration, but the County

did not provide all the footage that should exist.

206.    The treatment Ms. Glass endured is consistent with the jail's custom, policy, pattern, and

practice of using excessive force as a punitive measure and otherwise victimizing and abusing the

individuals detained there.

207.    The failure to preserve the video evidence of this abuse is consistent with the jail's custom,

policy, pattern, and practice of destroying public records documenting the abuse corrections staff

are perpetrating at the jail.

208.    Marsh pleaded guilty to assaulting Ms. Glass on November 18, 2019. On March 9, 2020, he

was sentenced to 180 days in jail, with 150 days suspended.

209.    Clark pleaded guilty to attempted felonious assault and unlawful restraint for what he did to

Ms. Glass on January 24, 2020. He also pleaded guilty for an extortion scheme in which he

threatened to release videos of other corrections officers in use-of-force incidents if they didn't offer

favorable testimony on his behalf about the lack of training they received and how the jail is run. On

March 9, 2020, he was sentenced to 18 months in prison for his crimes against Ms. Glass, to run

concurrently with his 18-month sentence for extortion.

210.    At his sentencing hearing, Defendant Clark defended his "decontamination" of Ms. Glass,

citing his training:

> Per the training that I received, we are to give three rinses, and after
> that we take them into the main dispensary area where the nurses will
> then wipe their face, take their blood pressure and take their
> temperature. After that they are then taken up in another floor where
> the containment room is where she will sit for at least a minimum of
> an hour. These are all part of the policies and procedures that
> Cuyahoga County has in place. I can only do what I'm asked to do in
> the way that I'm taught to do, nothing more. So once I take her up
> there, that's why you hear me say, "You'll have to wait an hour."
> That will be the minimum that she can wait.

**Corrections officer Darriell Hayes chokes Glenn Mayer Jr. for twitching while
receiving his medication for a neurological condition that causes muscle
spasms and twitching.**

211.    In August 2018, Glenn Mayer Jr. was booked into the jail. He was assigned to the medical

housing unit, which was designed for people who, like him, have serious medical conditions. His

podmates in the eight-man pod called him "Twitch," referring to his pronounced tremors.

212.    Each day, Mr. Mayer received medication to treat his condition, though the County did not

provide him with all his prescribed medications. Mr. Mayer had established a rapport with most of

the medical staff and with the corrections officer who was typically assigned to the unit.

213.    On October 16, 2018, during the second pill call, corrections officer Darriell Hayes was

assigned to substitute for the regular corrections officer. Hayes displayed a callous disregard for the

well-being of those housed in the medical unit. Before the attack on Mr. Mayer, Hayes prevented a

disabled inmate from stepping out of the cell, hollering: "I don't care about medical issues. I'm

treating this like a regular pod. I'll still put you on the ground."

214.    Hayes accompanied Nurse Heather Johnson in her routine distribution of medicine. Her

first stop was Mr. Mayer's cell. He stepped out of his cell to get his medicine.

215.     Because of Mr. Mayer's medical condition, nurses must hold his hand still to dispense his medication.

216.     As Nurse Johnson placed the medicine in Mr. Mayer's hand, it twitched slightly. Hayes grabbed Mr. Mayer from behind by the neck and squeezed hard. This aggression triggered an intense muscle spasm. His pills went flying. Hayes, with one hand still gripping Mr. Mayer's neck, slammed his opposite elbow into Mr. Mayer's back while yanking back on his neck. The spasms continued as Hayes continued to manhandle Mr. Mayer, squeezing his neck hard.

217.     Nurse Johnson eventually told Hayes to let Mr. Mayer go and explained his condition. Hayes did not immediately release Mr. Mayer despite what the nurse explained. Hayes replied, "I'm not used to this, I'm used to choking people out when things like this happen." Hayes eventually released Mr. Mayer.

218.     Even after releasing Mr. Mayer's neck, Hayes continued to torment him, insisting on performing multiple mouth-checks (where an officer observes the inside of a patient's mouth to confirm that he swallowed his pills) while Mr. Mayer, shaken from the attack, twitched erratically. Hayes did not relent until Nurse Johnson told him to leave Mr. Mayer alone. He returned to the safety of his cell and another detainee went out to get his medicine from the nurse. Outside the cell, Mr. Mayer could hear Hayes continuing to run his mouth about how he was used to "laying people out" and otherwise carrying on for the nurse as she attended to other patients.

219.     After Hayes's attack on him, Mr. Mayer experienced pain and discomfort. Though he initially retained his ability to walk, his physical condition rapidly deteriorated.

220.     Over the coming days, he experienced tingling and intermittent loss of mobility of his body. Within two days, he was suffering near-total paralysis. After treatment, he was confined to the use of a wheelchair for months, and he continues to require a walker for mobility for persistent left-sided weakness and loss of muscle control. Mr. Mayer's twitching has increased since the attack.

221.    When medical personnel responded to treat Mr. Mayer following his collapse, an SRT officer broke protocol and left his camera turned off. When another SRT member arrived with his camera rolling, the other one directed him to stop recording, preventing law enforcement from seeing or hearing evidence about the cause or extent of Mr. Mayer's injuries, and directed another officer to turn off his body-worn camera. The officer complied and cut short the recording of Mr. Mayer's agony on that day.

222.    The treatment Mr. Mayer endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

223.    Failing to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records that document the abuse corrections staff are perpetrating at the jail.

**Corrections personnel brutally attacked Corrionne Lawrence without provocation, used racial slurs, and threatened to kill him and "make it look like a suicide."**

224.    On September 16, 2018, Corrionne Lawrence was booked into the jail. He spent approximately four hours confined in a restraint chair as a punishment for speaking Spanish during the booking process. The responsible corrections officer failed to prepare and submit the required report documenting this use of the restraint chair. And the County destroyed the video footage of this use of the restraint chair.

225.    Before being assigned to a pod, Mr. Lawrence alerted corrections staff that he had to be kept separate from Stacey Norris, who was in the jail on charges that he murdered Mr. Lawrence's cousin.

226.    Though initially housing them separately, the jail relocated Mr. Lawrence to Mr. Norris's pod approximately one month later. As Mr. Lawrence was brought into his new pod, Mr. Norris

threatened Mr. Lawrence in the presence of corrections officers. Corrections staff then allowed Mr. Norris to attack Mr. Lawrence in his cell.

227.    Mr. Lawrence sustained no visible injuries in the Norris attack, but was taken to medical per protocol and was then released from medical.

228.    While Corporal Christopher Little escorted a handcuffed Mr. Lawrence from the infirmary to his new cell in disciplinary isolation, Little told Mr. Lawrence to step to the back of the elevator and face the wall. Mr. Lawrence complied and Little stated: "Let's play a game." Little then repeatedly punched Mr. Lawrence in the side of his face, punched and kicked him while he was on the floor, called him a "n*****," and threatened him if he did not keep his mouth shut. Cpl. Honaker witnessed this attack, but did not stop it or report it.

229.    Mr. Lawrence asked another employee, Brandon Smith, if he could go to the nurse, but Smith laughed in Mr. Lawrence's face.

230.    While still in isolation, a corrections officer threatened to mace Mr. Lawrence and told him "N**** I will kill you, hang you, and make it look like a suicide" when Mr. Lawrence asked for a shower. Over the past year, at least nine people incarcerated in the jail had died, including because of apparent suicide by hanging.

231.    Mr. Lawrence spent 12 days in isolation. Mr. Lawrence was interviewed repeatedly by the United States Marshals Service. During his interview, Mr. Lawrence revealed to the Marshals that Little had assaulted and threatened him.

232.    Smith escorted Mr. Lawrence from the interview and said: "Why you snitching? You a snitch now. Trying to get my boy indicted."

233.    The Marshals Service eventually demanded that the County transfer Mr. Lawrence and others out of the jail given the threats by SRT staff. Mr. Lawrence was taken to Geauga County jail for his own protection.

234. No one has been held accountable for attacking or threatening Mr. Lawrence.

235. Despite his request for surveillance or body-worn camera footage of Corporal Little assaulting him in the elevator, Cuyahoga County has produced none (despite Corporal Little's admission that Corporal Honaker's body-worn camera was activated).

236. No one was held accountable for the missing video footage.

237. Mr. Lawrence sued the County and corrections personnel Christopher Little, Brandon Smith, Barry Hickerson, and Beverly Witt. The matter settled for $140,000.

238. The treatment Mr. Lawrence endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

239. Failing to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse corrections staff are perpetrating at the jail.

**Jail staff beat and pepper sprayed Joseph Sawyer in his wheelchair for no reason.**

240. In October 2018, Joseph Sawyer was booked into the jail. Mr. Sawyer was confined to a wheelchair due to a degenerative bone condition. With no legitimate reason to do so, jail staff punched Mr. Sawyer in the face, pepper sprayed him, and strapped him into a restraint chair.

241. Jail staff failed to effectively decontaminate Mr. Sawyer from the pepper spray and refused to permit him to shower or change clothes for more than a week. Jail staff also denied him the use of a wheelchair.

242. The jail held no one accountable.

243. Mr. Sawyer asked the County to provide the video of the attack, but the County has provided nothing, claiming that no video records exist of Mr. Sawyer on the day of the attack.

244. No one was held accountable for the missing video footage.

245. The treatment Mr. Sawyer endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

246. Failing to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse corrections staff are perpetrating at the jail.

### Corrections officer Brandon Smith violently shoved Timothy Bennett while he was receiving an injection from medical staff.

247. On approximately November 1, 2018—during the Marshal's investigation at the jail— corrections officer Brandon Smith attacked Timothy Bennett as he was receiving an injection from medical staff at the diabetic cart, pushing Mr. Bennett while the needle was inserted in his back.

248. On information and belief, Smith was written up for this violent outburst. Compared with the many times corrections staff imposed punitive violence with no consequence, the isolated write up of Smith was an anomaly.

249. On information and belief, this stray instance of showing mild displeasure at an SRT officer hurting someone in custody was motivated by either the presence of medical staff during the incident or the ongoing federal investigation—about which Smith was furious.

250. The jail's own investigation into Smith's use of force against Mr. Bennett confirmed that just before Smith put his hands on Mr. Bennett at the diabetic cart that morning, Smith had called Mr. Bennett a "snitch" for speaking to federal investigators about jail conditions. Jail nurse Gwendolyn Bremer confirmed that Smith called Mr. Bennett a "snitch."

251. The treatment this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

**A corrections officer choked and dragged Tyrone Hipps Jr. because he complained about being denied the opportunity to pray.**

252.     When Tyrone Hipps Jr. was booked into the county jail, he informed the officers he was a Muslim and requested a no-pork diet.

253.     Practicing Muslims must pray five times per day, facing east toward the holy city of Mecca.

254.     On November 3, 2018, Mr. Hipps was preparing to pray at the eastern end of his dormitory when corrections officer Christopher Perdue approached Mr. Hipps and told him to go to his bed area. Mr. Hipps explained that he was about to pray. Perdue said: "Pray by your bed." Mr. Hipps explained that praying by his bed was improper because his faith requires him to pray facing the east with no one walking in front of him. Perdue then told Mr. Hipps to go pray in the day area. Mr. Hipps explained that praying in the day area would also be improper because people would still be in front of him while he was praying. Mr. Hipps tried to explain the importance of observing proper prayer protocols.

255.     In response to Mr. Hipps's explication of his religious custom, Perdue threatened to send Mr. Hipps to the hole. Consistent with the jail's practice of inmates having the right to request a corporal respond to resolve any issue or concern with a corrections officer, Mr. Hipps asked Perdue to get the corporal to resolve the issue. Perdue left, returned a few seconds later (without the corporal), and threatened: "I'm going to give you three chances to move, if you don't move by the third, I'm going to move you myself."

256.     Mr. Hipps complied with Perdue's command, picked up his prayer rug, and walked towards his bunk. He said: "This is my religion. I could sue you for this." Perdue responded: "I'll give you something to sue for." Perdue then grabbed Mr. Hipps and put him in a chokehold. Perdue dragged Mr. Hipps to the front of the pod, threw him on his face, and told him to stop resisting.

257.     Another officer had to physically remove Perdue from Mr. Hipps.

258.     Despite having done nothing wrong, Mr. Hipps spent the next five days in the hole.

259.    He remained in the hole for two days after an investigator visited Mr. Hipps in the hole and confirmed that the video showed he had done nothing wrong.

260.    Despite Perdue's vicious attack on Mr. Hipps, jail administration did not place Perdue on leave or even separate Perdue from Mr. Hipps. Perdue constantly taunted Mr. Hipps when he returned from the hole.

261.    No one has been held accountable for attacking Mr. Hipps.

262.    The video evidence of this attack that the County has provided in response to public-records requests by media and others excludes footage of part of the attack. The County can provide no explanation for this apparent tampering, and has provided little of the surveillance video of Mr. Hipps's time in custody that should exist.

263.    No one was held accountable for the missing video footage.

264.    Mr. Hipps sued the County and Mr. Perdue. The matter settled for $140,000.

265.    The treatment Mr. Hipps endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

266.    Failing to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse corrections staff are perpetrating at the jail.

### Corrections officer Charles Enoch attacked Jasper Muldrow for singing, putting him in a dangerous rear naked chokehold.

267.    On November 12, 2018, corrections officer Charles Enoch, who touts being "trained in ground fighting," used excessive and entirely unnecessary force against Jasper Muldrow, pushing and punching him before putting him in a rear naked chokehold. In Brazilian jiu jitsu, the move is called Mata-Leão, which means "lion killer."

268.     Other officers then pepper sprayed and strapped Mr. Muldrow into a restraint chair.

269.     Enoch attacked Mr. Muldrow because he was singing during the 20 minutes he was allotted out of his cell each day.

270.     Mr. Muldrow suffered a broken wrist. The County did not transport him to the hospital to receive medical care for the broken bone until five days later.

271.     In explaining his use of the rear naked chokehold, Enoch asserted in a written statement that while "it would appear that inmate was being choked," "in actuality" he wasn't. Enoch explained that "according to doctors + MMA [mixed martial arts], and Ju Jitsu coaches when a 'choke hold' is applied correctly, the person being choked will lose consciousness with in 4 to 7 seconds." He essentially tried to excuse the attack because he failed nail the move.

272.     The jail found that Enoch failed to attempt to disengage before using force, failed to document what had actually transpired, and used excessive force.

273.     Enoch is a 12-year veteran of the corrections staff. His behavior in attacking Mr. Muldrow is consistent with what Enoch understood to be something he could get away with based on how the jail had responded (or failed to respond) to past use-of-force incidents.

274.     The treatment Mr. Muldrow endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

### A corrections officer emptied a can of pepper foam into Daniel Ford Jr.'s face as he suffered a PTSD attack.

275.     In December 2018, Daniel Ford Jr. was booked into the jail. Mr. Ford suffers from post-traumatic stress disorder. Corrections staff refused to provide his mental-health medication.

276.     Mr. Ford was attacked by another inmate and put into administrative segregation.

277.     Corrections officers left him in a cell with blood, feces, and urine in it without clothing or sheets.

278.    When Mr. Ford begged corrections officers to let him clean the cell or give him a blanket, they refused.

279.    Staff eventually brought Mr. Ford clothing when they came to confine him to a restraint chair. While restrained, the staff emptied a can of pepper spray in his face as he experienced a PTSD episode because of the jail's failure to provide his medication.

280.    Corrections staff did not properly decontaminate Mr. Ford, leaving him covered in pepper-spray residue.

281.    The jail held no one accountable.

282.    Mr. Ford requested video of these events, but Cuyahoga County has provided only a fraction of the video that should exist of his mistreatment.

283.    No one was held accountable for the missing video footage.

284.    The treatment Mr. Ford endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

285.    Failing to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse corrections staff are perpetrating at the jail.

**Jail staff restrained, beat, and pepper sprayed Antoine Blackshear without legitimate reason to do so.**

286.    During a single week in December 2018–January 2019, with no legitimate reason to do so, jail staff confined Antoine Blackshear to a restraint chair, beat him, and shot him with guns loaded with pepper-foam bullets at least six times.

287.    Jail staff failed to adequately decontaminate Mr. Blackshear before releasing him.

288.    The jail held no one accountable.

289.     Mr. Blackshear has requested records of his mistreatment, but the jail has failed to provide numerous videos—likely in the dozens—showing how corrections officers assaulted him.

290.     No one was held accountable for the missing video footage.

291.     The treatment Mr. Blackshear endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

292.     Failing to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse corrections staff are perpetrating at the jail.

### Corrections staff pepper sprayed and restrained Margaret Jackintell, an elderly veteran with mental-health issues, for no reason.

293.     Margaret Jackintell is a 57-year-old Navy veteran who suffers from mental illness. She was booked into the county jail in December 2018.

294.     While incarcerated, she observed a corrections officer verbally abusing other incarcerated women. She voiced her disagreement with the way he was addressing them.

295.     As she sat calmly at a table in her pod, corrections staff took her to the ground and triggered an anxiety attack. Two guards saturated her with pepper spray before strapping her into a restraint chair.

296.     Jail staff left Ms. Jackintell in the restraint chair, covered in pepper spray, for approximately 10 hours and 15 minutes. She was denied food, water, or the opportunity to use the restroom.

297.     For days after she was released from the chair, corrections staff refused to allow her to shower or clean herself.

298.     After she endured this abuse, Corporal Brad Bitterman repeatedly came to her cell to taunt her saying, e.g., "You're no fucking kind of veteran, you fucking bitch! I don't believe you're a veteran."

299.    The jail held no one accountable.

300.    Ms. Jackintell, through counsel, requested video of her time in custody. But the County did not provide surveillance video that should have existed of the attack and its aftermath, and it produced body-worn camera video from only Cpl. Brad Bitterman.

301.    No one was held accountable for the missing video footage.

302.    The treatment Ms. Jackintell endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

303.    Failing to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse corrections staff are perpetrating at the jail.

**Corrections officers beat Terrence Debose while he was strapped into a restraint chair.**

304.    On March 22, 2019, a corrections officer strapped Terrence Debose in a restraint chair in a small cell. Mr. Debose suffers from mental illness.

305.    While Mr. Debose was restrained, Corporal Nicholas Evans turned off his body-worn camera and repeatedly punched Mr. Debose in the face.

306.    A screen shot from the jail-surveillance video of the beating follows:



307.    Another corrections officer, Timothy Dugan, entered the room and joined in the abuse, punching Mr. Debose twice in the face.

308.    Because of the attack, Mr. Debose suffered a concussion.

309.    Evans was indicted for felonious assault and Dugan was indicted for misdemeanor assault. Both pleaded guilty. Evans was sentenced to 9 months incarceration and Dugan was sentenced to 10 days.

310.    The jail held no one accountable.

311.    The treatment Mr. DeBose endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

**Corrections officers pepper sprayed and physically abused Michael Roarty-Nugent when he asked for an extra milk during breakfast.**

312.    On April 4, 2018, Michael Roarty-Nugent asked the officer on breakfast rounds, Sandra Johnson, if he could have an extra milk. The officer at first agreed, but then changed her mind.

She began to close the cell door on Mr. Roarty-Nugent's foot, and he instinctively protected himself by blocking the door with his arm. Officer Johnson then called Corporal Steven Boardman, claiming that he had somehow attempted to assault her.

313.    SRT officers Bruce R. Smith III and Russell Graham responded and, after ordering him to bundle all of his belongings into his bedsheet, handcuffed his hands behind his back. They made him balance the bundle of his possessions on top of his handcuffed wrists. Officers Smith and Graham told him he was going from his cell to "the hole," but Defendant Smith would later say in his incident report that he came to Mr. Roarty-Nugent's cell to walk him to the medical dispensary. Mr. Roarty-Nugent didn't need nor request medical care before the officers arrived.

314.    While Officer Smith escorted Mr. Roarty-Nugent down the hall to the elevator, he repeatedly pushed Mr. Roarty-Nugent into the wall and taunted him to "Do something! Do something!" while telling him to stop resisting, even though Mr. Roarty-Nugent had not resisted and remained compliant and cooperated in the transport process. Officer Smith's actions appeared intended to provide a pretext for the use of force.

315.    Instead of taking him to "the hole," the officers took Mr. Roarty-Nugent to the sixth floor. When the elevator doors opened, Officer Smith slammed Mr. Roarty-Nugent—who was still handcuffed—onto the ground, face-down and began kicking him all over his body. On information and belief, Corporal Boardman and Defendants Smith and Graham all actively participated in this violent beating and assault. No one nearby intervened, verbally or physically, to stop the attack. At one point during the attack, one or more of the corrections officers kicked him in the genitals, causing pain and injury.

316.    As they held him facedown on the ground, still handcuffed, Officer Smith deployed an excessive amount of pepper foam all over his face from just a few inches away—for three-to-five

seconds. Mr. Roarty-Nugent, who has asthma, felt like he could not breathe through the pepper foam, which was all over his face and in his mouth and nose.

317.    Only after these officers attacked and pepper sprayed Mr. Roarty-Nugent did Corporal Boardman finally activate his body-worn camera.

318.    After deploying pepper foam, jail staff unnecessarily strapped Mr. Roarty-Nugent into a restraint chair and did not effectively decontaminate Mr. Roarty-Nugent. His breathing remained labored and orange pepper foam visibly covered his face as he asked for help over and over while moaning in pain.

319.    He was kept in an isolation cell for several hours without water, a shower, new clothes, or access to a restroom. He was then taken to the hole, but was denied a shower, clean clothes, or sheets for several days. Mr. Roarty-Nugent spent 11 days in the hole.

320.    The jail held no one accountable for these officers' savage battery of a restrained inmate and unnecessarily cruel failure to effectively decontaminate, which only served to prolong his suffering.

321.    Mr. Roarty-Nugent requested video of these events, but Cuyahoga County claims that no surveillance video exists and has provided only limited, incomplete body-worn camera video. Cuyahoga County claims no surveillance footage exists because no functioning surveillance cameras covered the areas where the officers transported Mr. Roarty-Nugent nor where they beat and pepper-sprayed him. On information and belief, the officers deliberately escorted Mr. Roarty-Nugent to an area not covered by surveillance cameras to violently assault Mr. Roarty-Nugent without getting caught.

322.    No one was held accountable for the missing body-worn video, even though Cuyahoga County jail policy requires all SRTs responding to Code 10-25 requests for assistance to

immediately activate their body-worn cameras and even though policy also requires all officers to activate their body-worn cameras during any use of force against an inmate.

323.    No one was held accountable for the surveillance video that should have existed nor for the custom, policy, pattern, and practice of allowing corrections officers to commit acts of violence against inmates in areas of the jail not covered by surveillance cameras.

324.    The treatment that Mr. Roarty-Nugent endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

325.    Failing to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse that corrections staff are perpetrating at the jail.

326.    On information and belief, there are incidents of excessive force and abuse by corrections officers—including retaliatory and punitive use of force, restraints, and pepper spray—besides those listed above.

327.    The failure of County administration to respond appropriately to acts of gratuitous and excessive violence in the years leading up to December 17, 2019 left corrections personnel with the unmistakable impression that unprovoked brutality was acceptable. And corrections personnel acted accordingly by engaging in ever-more-egregious acts of violence. The County administration encouraged this violence by responding with callousness to inmates' physical and medical needs.

328.    The County has a custom, policy, pattern, and practice of failing to use body-worn cameras to document incidents at the jail. Defendant Ivey was indicted and pleaded guilty on charges stemming from his direction to corrections staff not to film certain incidents or encounters (because the video could help people pursue civil lawsuits against the County). He resigned as part of a plea deal in the fall of 2019.

329.     The County has a custom, policy, pattern, and practice of failing to preserve and maintain public records as required by law and consistent with the applicable records-retention schedule and preservation obligations triggered by pending or anticipated litigation. The County destroyed public records depicting the incidents described above in violation of Ohio public-records law. The systematic and unauthorized deletion of jail surveillance video will permit corrections staff to misrepresent facts regarding the systemic abuses perpetrated in the facility.

330.     In October 2019, Ohio Attorney General Dave Yost launched a criminal investigation into missing county records in the County's SharePoint system, which is a document-sharing and storage platform. Certain documents known to be in that system have since been deleted, precluding review and examination of metadata that would reveal which employees accessed or otherwise interacted with records. The County defied a court order from Judge Patricia Cosgrove in failing to preserve the records. The County also failed to preserve the records as required by the applicable records-retention schedule.

## CLAIM 1
### FIRST AMENDMENT RETALIATION
### UNDER 42 U.S.C. § 1983
### (AGAINST DEFENDANT CLEMENTS)

331.     Mr. Nelson incorporates all previous allegations.

332.     The First Amendment protects the right of all Americans—even those in pre-trial detention—to speak freely and to petition the government for redress of grievances.

333.     Under the First Amendment, Mr. Nelson's complaints about jail conditions were protected speech, and his request to speak to a corporal was a protected petition for redress of grievances.

334.     Defendant Clements's attack on Mr. Nelson was retaliation for Mr. Nelson's protected speech and conduct.

335.     The attack on Mr. Nelson would deter a person of ordinary firmness from continuing to engage in that protected conduct, as would the lies calculated to result in his placement in solitary confinement.

336.     As a direct and proximate result of Defendant Clements's unlawful activity, Mr. Nelson has suffered and will continue to suffer economic and non-economic damages for which Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

337.     Defendant Clements's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendant Clements and others from engaging in this type of unlawful conduct.

## CLAIM 2
### FOURTEENTH AMENDMENT EXCESSIVE-FORCE VIOLATION
### UNDER 42 U.S.C. § 1983
### (AGAINST DEFENDANT CLEMENTS)

338.     Mr. Nelson incorporates all previous allegations.

339.     The Fourth Amendment prohibits the government from subjecting a seized person to the use of force that is not objectively reasonable in light of the facts and circumstances confronting them.

340.     Defendant Clements used objectively unreasonable force against Mr. Nelson, a pre-trial detainee.

341.     The entire time Defendant Clements was attacking Mr. Nelson, Mr. Nelson was locked in a cell behind a large, locked, metal door. From where he stood when he started stomping Mr. Nelson's arm, Defendant Clements faced no danger.

342.     Defendant Clements's blatant disregard of written policy caused Mr. Nelson unreasonable physical, mental, and emotional pain.

343.     Defendant's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendant and others from engaging in this unlawful conduct.

CLAIM 3
MONELL LIABILITY, 42 U.S.C. § 1983—
UNCONSTITUTIONAL CUSTOM, POLICY, OR PRACTICE
(AGAINST DEFENDANT CUYAHOGA COUNTY)

344.    Mr. Nelson incorporates all previous allegations.

345.    Defendant Cuyahoga County permits, tolerates, and is deliberately indifferent to a pattern

and practice of excessive force by its corrections officers at the jail. This widespread tolerance of

excessive force by corrections officers constitutes a county policy, practice, pattern, and custom, and

led to a corrections officer attacking Mr. Nelson on December 17, 2019 without valid reason.

346.    The behavior of Defendant Clements that harmed Mr. Nelson is part of a recurring pattern

of excessive force used on the people in custody at the county jail.

347.    Cuyahoga County has failed to provide its corrections staff with acceptable working

conditions by grossly understaffing its jail. This understaffing makes jail staff more fearful and likely

to overreact to any situation that arises. Regularly working under such conditions means there will

be more violence. When that violence is not punished, staff learn that violence is allowed or even

encouraged as a mechanism for control. Supervisors should have anticipated that corrections

personnel would be angry and frustrated about terrible employment conditions and were likely to

take out that anger on those in custody.

348.    Per the jail's *written* policies, use of force is ostensibly supposed to be limited to instances of

justifiable self-defense, prevention of self-inflicted harm, protection of others, prevention of riot,

prevention of escape or other crimes, controlling or subduing an inmate who refuses to obey a staff

command, and discharge of a firearm or other weapon.[5] But the jail regularly allows corrections

officers to use force against inmates in other instances not listed in its written policies. Even when

the jail does investigate or impose any sanction, it is typically nothing more than a slap on the wrist.

---

[5] *See* Cuyahoga County Corrections Center Policy and Procedures, Use of Force (Response to Resistance),
Policy No. 0002 (effective Jan. 1, 2016).

Based on the totality of the circumstances, the jail's actual policy, custom, pattern, and practice is contrary to its written policy.

349.    The use of force is regularly used as a punishment or a form of discipline by corrections officers at the jail, including when corrections personnel don't like what an incarcerated citizen has to say. And the County has time and again failed to appropriately discipline officers who engage in such tactics, resulting in a clear understanding among those incarcerated that they are subject to indiscriminate violence for any perceived slight or irritation that they might inspire in an officer. Inmates justifiably fear being attacked by jail staff for no good reason.

350.    Because the County has for so long tolerated acts of indiscriminate and excessive violence against people in custody, Defendant Clements understood he was free to abuse Mr. Nelson (or anyone else) without endangering his job.

351.    Cuyahoga County's customs, policies, patterns, and practices have created a toxic culture that has desensitized its corrections personnel to brutal, sadistic violence at the jail because that violence is something wholly unremarkable. Corrections officers' savage and casual resort to violence is an ordinary aspect of jail culture that those incarcerated have learned to expect and that those responsible for overseeing the jail staff have fostered and tolerated.

352.    Based on previous unjustified uses of excessive force, Defendant Cuyahoga County had notice of a pattern of constitutionally offensive acts by its corrections officers but took no remedial steps in response to the notice.

353.    Cuyahoga County lacked proper administrative controls to ensure that staff conducted their work in a constitutional manner.

354.    The culture of the punitive violence cultivated at the county jail was apparent to federal investigators who assessed the facility in October–November 2018.

355.     By permitting, tolerating, and sanctioning a persistent and widespread custom, policy, pattern, and practice of corrections officers using excessive force against people in custody, under which Plaintiff was assaulted, Defendant Cuyahoga County deprived Plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States.

356.     Defendant Cuyahoga County tolerated and failed to prevent the incidents of excessive force against numerous incarcerated citizens including, but not limited to Mr. Nelson, Lucille Dumas, Joshua Castleberry, Blanche Hill, Chantelle Glass, Chariell Glaze, Corrionne Lawrence, Glenn Mayer, Jr., Joseph Sawyer, Timothy Bennett, Tyrone Hipps, Jr., Jasper Muldrow, Daniel Ford, Jr., Antoine Blackshear, Margaret Jackintell, Terrence Debose, Michael Roarty-Nugent, and others.

357.     Despite the sheriff's repeated admissions about the problems in the jail and the need to change the violent and abusive culture among the corrections staff, the County has not disciplined all the corrections staff who have used excessive force against inmates, or held anyone in jail administration or County administration accountable for perpetrating the greatest human-rights crisis in this community's history. Nor has anyone been held accountable for the mass deletion of jail surveillance videos that captured these horrific events as they unfolded.

358.     As a direct and proximate result of the Defendant County's unlawful conduct, Plaintiff suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

### CLAIM 4
### *MONELL* LIABILITY, 42 U.S.C. § 1983—FAILURE TO TRAIN/SUPERVISE
### (AGAINST DEFENDANT CUYAHOGA COUNTY)

359.     Mr. Nelson incorporates all previous allegations.

360.     What little training the County provided its corrections officers in the time leading up to Defendant Clements's attack on Mr. Nelson, it was inadequate for the tasks that officers must perform.

361. That inadequacy was the result of the County's deliberate indifference to the rights of those held in its jail. Defendant Cuyahoga County permits, tolerates, and is deliberately indifferent to its failure to train and supervise corrections officers and other jail personnel, including nurses, on how to interact with people in custody, including how to use force appropriately in a correctional setting, how to not sadistically abuse inmates, how to provide medical care to people in urgent and evident distress (including how to properly decontaminate people subjected to pepper spray), how to effectively decontaminate those sprayed with chemical agents, and the constitutional obligation of how to intervene to prevent coworkers from using excessive force against those in custody.

362. Defendant Cuyahoga County failed to train and supervise its corrections officers on how to use the best use-of-force tactics to ensure the safety of both staff and incarcerated citizens. The behavior of Defendant Clements is consistent with a recurring pattern of how corrections officers interact with people in custody at the Cuyahoga County Corrections Center, due to a lack of training and accountability, and due to a general tolerance for ignoring the humanity of those in the jail. Cuyahoga County failed to adequately train corrections staff on conflict resolution, de-escalation techniques, and anger management.

363. Defendant Cuyahoga County had notice of its failure to train and supervise its corrections personnel, which resulted in a pattern of constitutionally offensive acts by its corrections officers. But Defendant County took no remedial steps in response to the notice.

364. Defendant Clements behaved as he did because it was consistent with Defendant Cuyahoga County's culture of violence and abuse against the people detained in its jail.

365. Defendant Cuyahoga County has, despite notice, tolerated and nurtured its corrections officers' violent and abusive conduct by failing to intervene and prevent abuse.

366. For example, Defendant Cuyahoga County tolerated and failed to prevent the incidents of excessive force against numerous incarcerated citizens including, but not limited to, Lucille Dumas,

Joshua Castleberry, Blanche Hill, Chantelle Glass, Chariell Glaze, Corrionne Lawrence, Glenn

Mayer, Jr., Joseph Sawyer, Timothy Bennett, Tyrone Hipps, Jr., Jasper Muldrow, Daniel Ford, Jr.,

Antoine Blackshear, Margaret Jackintell, Terrence Debose, Michael Roarty-Nugent, and others.

367.    Defendant Cuyahoga County has, despite notice, tolerated and nurtured its corrections

officers' violent and abusive conduct by failing to train its corrections personnel on their

constitutional obligation to intervene and prevent abuse.

368.    Defendant County knew that it was not enforcing its written policies and that its corrections

staff, including Defendant Clements, lacked relevant training. The County also knew that its chronic

failure to adequately staff the jail while continuously marketing itself to take in more and more

incarcerated population from Cleveland and the surrounding communities would lead to predictable

disaster. Yet, Defendant County failed to take basic steps to mitigate the disaster it created.

369.    Defendant County also was deliberately indifferent to its obligation to preserve public

records depicting the activities in the jail—including use-of-force incidents—that would prove that

inmate allegations of misconduct are true. Instead, the County carried out mass deletion of jail

surveillance footage and otherwise operated an insecure computer system that allowed individual

corrections personnel to avoid uploading use-of-force videos captured on body-worn cameras,

delete videos, rename videos, or transfer video files out of the system where they are customarily

stored.

370.    As detailed above, Defendant Cuyahoga County tolerated and failed to prevent the incidents

of excessive force against numerous incarcerated citizens and failed to train its staff to preserve

evidence of use-of-force incidents.

371.    The County consistently tolerated a practice by jail staff of falsely reporting use of force and

the circumstances (or lack thereof) leading to that use of force. The corrections staff's ability to get

away with false reporting encouraged more violence by lessening accountability.

372.     Besides the constant threat of punitive violence, Cuyahoga County's incarcerated population also lives with deplorable conditions including acute overcrowding, lack of medical care, inadequate nutrition and hygiene, vermin infestations, and a cascade of other horrific conditions. The jail is a crucible of misery of which the County has been on notice and aware for years. In a move calculated to inflict unnecessary suffering on the incarcerated population, jail administration deliberately moved medical screenings from the intake area to avoid having medical personnel observe and evaluate new arrivals in need of medical care, including mental-health and substance-abuse treatment. Despite its obligation to maintain minimum standards under Ohio Administrative Code Chapter 5120:1-8 and the Federal Performance-Based Detention Standards of the United States Department of Justice, the County allowed the jail to devolve into abject squalor.

373.     In November 2018, several county judges wrote to jail administration about poor conditions in the jail. One judge said, "The County's indifference to the dangers created by failing to meet the needs of a very fragile and volatile prison population must end." Others blasted the woefully inadequate medical care.

374.     The County's deliberate indifference to the needs of its inmate population and the conditions under which they are forced to survive led directly to the deaths of nine inmates: on June 10, 2018, Theodore Carter died at the jail from complications from cancer; on June 26, 2018, Esteban Parra died at the jail from an overdose; on July 3, 2018, Larry Johnson died at the jail from suicide; on August 28, 2018, Jose Arquillo died at the jail from an overdose (Defendant Ivey would later be charged and plead guilty to charges stemming from his direction to a corrections officer to turn off his body camera during this incident); on August 30, 2018, Gregory Fox died at the jail from suicide; on August 31, 2018, Randall Rain died at the jail from suicide; on October 2, 2018, Allen Gomez Roman died at the jail from suicide; on December 30, 2018, Brandon Kiekisz died at the jail from suicide; on May 10, 2019, Nicholas Colbert died at the jail from suicide; on August 30, 2020,

Lea Daye died at the jail, the cause of which is pending investigation; on July 8, 2020, Michael Wormick died at the jail, the cause of which is pending investigation; and on November 9, 2020, Shone Trawick died at the jail by beating from another inmate.

375.    Despite its awareness of the overcrowding, understaffing, lack of adequate medical care, use of excessive force, destruction of video and other evidence, and other misconduct at the jail, Defendant Cuyahoga County has refused to mitigate this disaster.

376.    Conditions at the jail remain so atrocious that in September 2019 the corrections officers filed to begin the process of changing the union that will represent them in collective-bargaining negotiations with the County from the Ohio Patrolmen's Benevolent Association to the Fraternal Order of Police. The officers cited involuntary overtime and unsafe working conditions (such as double- and quadruple-podding—leaving a single officer in charge of 100–200 inmates at a time) as some of the concerns prompting the change in their bargaining representative.

377.    The State of Ohio Department of Rehabilitation and Correction has also found serious deficiencies with the jail's conditions. Two separate inspections in 2019 revealed a combined 150 violations of state standards.

378.    Specially appointed assistant Ohio attorneys general have indicted numerous current or former jail employees including the former director of regional corrections, the former warden, as well as supervisors and line corrections officers. The charges include violent crimes, drug crimes, dereliction of duty, and tampering with evidence, among others.

379.    Defendant Budish appointed an utterly unqualified individual to run the jail system and took no steps to exercise his authority as county executive to ensure the jail was properly managed and that those in custody were safe.

380.    Defendant County's Inspector General found that "a perceived culture of retaliation limited the County's ability to identify and correct problems." Personnel feared that management would retaliate if staff reported issues.

381.    Mills's refusal to acknowledge the difficulty and complexity of the profession of corrections officer was largely responsible for the training failures within the facility at every level.

382.    Defendant County permitted, tolerated, and sanctioned a persistent and widespread custom, policy, pattern, and practice of deliberate indifference to failing to train and supervise corrections officers (1) not to use excessive force including use of restraints and/or chemical agents like pepper spray, (2) to provide medical care to people in distress, (3) to permit access to showers, restrooms, clothing, and food, and (4) to follow its written policies rather than its actual abusive customs, policies, patterns, and practices. As a result, Plaintiff was assaulted and did not receive timely or humane medical care for injuries he sustained when Defendant Clements attacked him. Defendant Cuyahoga County deprived Plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States.

383.    As a direct and proximate result of Defendant Cuyahoga County's unlawful conduct, Plaintiff suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

## CLAIM 5
### INTENTIONAL TORT—ASSAULT
### (AGAINST DEFENDANT CLEMENTS)

384.    Mr. Nelson incorporates all previous allegations.

385.    Defendant Clements' intentional actions caused Mr. Nelson reasonable apprehension of an immediate harmful or offensive contact.

386.    As a direct and proximate result of Defendant Clements's unlawful activity, Mr. Nelson has suffered and will continue to suffer economic and non-economic damages for which Defendant Clements is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

387.    Defendant Clements's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendant Clements and others from engaging in this type of unlawful conduct.

### CLAIM 6
### INTENTIONAL TORT—BATTERY
### (AGAINST DEFENDANT CLEMENTS)

388.    Mr. Nelson incorporates all previous allegations.

389.    Defendant Clements engaged in the above-described actions intending to cause the harmful contact that resulted. The offensive contacts were unlawful and unwanted.

390.    As a direct and proximate result of Defendant Clements's unlawful conduct, Mr. Nelson suffered and will continue to suffer economic and non-economic damages for which Defendant Clements is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

391.    Defendant Clements's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendant Clements and others from engaging in this type of unlawful conduct.

### CLAIM 7
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST DEFENDANT CLEMENTS)

392.    Mr. Nelson incorporates all previous allegations.

393.    In conducting himself as he did, Defendant Clements either intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress to Mr. Nelson.

394.     Defendant Clements's conduct in stomping on Mr. Nelson's arm and hand five times in 10 seconds while Plaintiff was secured in a locked cell was extreme and outrageous. His conduct went beyond all possible bounds of human decency and was such that is could be considered intolerable in civilized society.

395.     As a direct and proximate result of Defendant Clements's unlawful conduct, Mr. Nelson has suffered and will continue to suffer mental anguish so serious and of such a nature that no reasonable person could be expected to endure it and for which Defendant Clements is liable.

396.     Defendant Clements's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendant Clements and others from engaging in this type of unlawful conduct.

### CLAIM 8
### INTENTIONAL TORT—SPOLIATION
### (AGAINST DEFENDANT CROUCHER)

397.     Mr. Nelson incorporates all previous allegations.

398.     After Defendant Clements's attack on Mr. Nelson, it was probable that litigation involving Mr. Nelson would be forthcoming. The County knew that litigation involving Mr. Nelson was probable.

399.     The County produced body-worn camera video footage of Defendant Clements' attack on Mr. Nelson, but did not produce any surveillance footage.

400.     The jail—under Defendant Croucher's supervision—willfully destroyed this surveillance footage in violation of its retention schedule, with a purpose to disrupt Mr. Nelson's case.

401.     By destroying evidence, Defendant Croucher injured Mr. Nelson by depriving him of the ability to show a jury exactly what occurred leading up to and during the attack.

## CLAIM 9
### RECKLESS HIRING, TRAINING, SUPERVISION, DISCIPLINE, STAFFING, AND RETENTION
### (AGAINST DEFENDANTS IVEY AND CROUCHER)

402.    Mr. Nelson incorporates all previous allegations.

403.    Before applying for a position as a corrections officer, Defendant Clements had a long history of criminal offenses putting the County on notice that he was not suitable for employment as a corrections officer.

404.    Mr. Clements's record included, for instance, a charge for improperly handling a firearm and multiple charges of using fictitious license plates.

405.    The charges against Defendant Clements included offenses foreshadowing his conduct in this case, putting the County on notice that he was apt to engage in violence and falsify records.

406.    Defendant Clements was not the only corrections officer hired despite the existence of a disqualifying criminal history.

407.    Aware that many of its applicants were similarly disqualified from employment but unwilling to adequately fund the jail to recruit qualified applicants, the jail—under the supervision of Defendants Ivey and Croucher—adopted a policy of hiring applicants—including Mr. Clements—without conducting mandatory background checks required by law.

408.    Throughout his employment, Defendant Clements repeatedly used excessive or unnecessary force on inmates and detainees in violation of their constitutional rights and official (but unenforced) County policies.

409.    During his employment, Defendant Clements was charged with and convicted of driving under the influence.

410.    People who operate under the influence are dangerous to the safety of those around them due to their inability to control their impulses.

411.    The other defendants knew about Defendant Clements's DUI conviction but did not take any meaningful discipline

412.    Defendant Clements had impulse-control problems and that he was willing to allow them

413.    Despite—and because of—his pattern of unlawful conduct, the County continued to employ Defendant Clements without taking any meaningful action to mitigate the obvious risk that he would inflict further injuries.

414.    Defendants failed to exercise due care and acted in a reckless manner in hiring, training, supervising, disciplining, staffing, and retaining the individual defendants.

415.    Defendants' reckless conduct in this regard proximately caused Mr. Nelson's injuries alleged above.

416.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Nelson sustained damages.

### CLAIM 10
### RECORDS DESTRUCTION, OHIO REV. CODE § 149.351
### DESTRUCTION OF RECORDS, OHIO REV. CODE § 149.131
### (AGAINST DEFENDANT CUYAHOGA COUNTY)

417.    Mr. Nelson incorporates all previous allegations.

418.    Under Ohio Rev. Code § 149.351, government records may not be removed, destroyed, mutilated, transferred, or otherwise damaged or disposed of except under a records-retention schedule approved by the county records commission, the state auditor, and the Ohio History Connection.

419.    Any person aggrieved by a violation or threatened violation of that prohibition may commence civil actions for injunctive relief to compel compliance to obtain reasonable attorneys' fees, and recover a forfeiture for each violation.

420.    The County removed, destroyed, mutilated, transferred, or otherwise damaged or disposed of the surveillance video records of Defendant Clements's attack on Plaintiff in violation of its retention schedule.

421.    Mr. Nelson is aggrieved by the destruction of those records, which will limit his ability to present evidence of his claims against Defendant Clements and the County.

**CLAIM 11**
**CIVIL LIABILITY FOR CRIMINAL ACTS UNDER R.C. 2307.60(A)(1)**
**(AGAINST DEFENDANTS CLEMENTS AND BUDISH)**

422.    Mr. Nelson incorporates all previous allegations.

423.    Under Ohio Rev. Code § 2307.60 (A)(1), "Anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action," including attorneys' fees and punitive damages.

424.    Defendant Clements's conduct constituted criminal acts including, but are not limited to,

   a.   Felonious assault (R.C. 2903.11(A)(1));

   b.   Assault (R.C. 2903.13(A));

   c.   Falsification (Ohio Rev. Code § 2921.13);

   d.   Interfering with civil rights (R.C. 2921.45(A));

   e.   Intimidation (R.C. 2921.03(A)); and

   f.   Dereliction of duty (R.C. 2921.44(C)(2)).

425.    Defendant Budish's conduct constituted criminal acts including, but are not limited to,

   a.   Dereliction of duty (R.C. 2921.44); and

   b.   Interfering with civil rights (R.C. 2921.45)

426.    As a direct and proximate result of Defendants' criminal acts, which showed a spirit of ill-will, hatred, and wanton disregard of Mr. Nelson's rights, Mr. Nelson has suffered and will continue to suffer economic and non-economic damages for which Defendants are liable, including, but not limited to mental, emotional, and physical pain and suffering, as well as punitive damages.

427.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendant and others from engaging in this type of unlawful conduct.

## CLAIM 12
### INTIMIDATION
### UNDER U.S.C. § 2921.03
### (AGAINST DEFENDANT CLEMENTS)

428.    Mr. Nelson incorporates all previous allegations.

429.    No person, knowingly and by force, by unlawful threat of harm to any person or property, or by filing, recording, or otherwise using a materially false or fraudulent writing with malicious purpose, in bad faith, or in a wanton or reckless manner, shall attempt to influence, intimidate, or hinder a public servant, party official, or witness in the discharge of the person's duty.

430.    Through his materially false or fraudulent writings, Defendant Clements attempted to influence multiple public servants and witnesses, supervisors, and Defendant Cuyahoga County in the discharge of their duties.

431.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer mental anguish so serious and of such a nature that no reasonable person could be expected to endure it and for which Defendant is liable.

## PRAYER FOR RELIEF

For the reasons stated, Mr. Nelson respectfully requests the following relief from the Court:

A.    Declare that Defendants' acts and conduct constitute violations of the First, Fourth, and Fourteenth Amendments to the United States Constitution, as well as violations of 42 U.S.C. § 1983 and state law;

B.    Enter judgment in Mr. Nelson's favor on all claims for relief;

C.    Award full compensatory damages including, but not limited to, damages for pain and suffering, mental anguish, emotional distress, humiliation, embarrassment, and inconvenience that Mr. Nelson has suffered and is reasonably certain to suffer in the future;

D.    Award punitive and exemplary damages for the individual Defendants' egregious, willful, and malicious conduct (note that, consistent with well-established law, Mr.

Nelson does not seek punitive damages from Cuyahoga County but instead only from Defendant Clements);

E.    Award pre- and post-judgment interest at the highest lawful rate;

F.    Award Mr. Nelson his reasonable attorneys' fees and all other costs of suit; and

G.    Award all other relief in law or equity, including injunctive relief, to which Mr. Nelson is entitled and that the Court deems equitable, just, and proper.

## JURY DEMAND

Mr. Nelson demands a trial by jury on all issues within this complaint.

Respectfully submitted,

THE CHANDRA LAW FIRM LLC

*/s/ Brian D. Bardwell*
Subodh Chandra (0069233)
Jessica Savoie (0099330)
Brian D. Bardwell (0098423)
The Chandra Law Building
1265 W. 6th St., Ste. 400
Cleveland, Ohio 44113
216.578.1700 Phone
216.578.1800 Fax
Subodh.Chandra@ChandraLaw.com
Jessica.Savoie@ChandraLaw.com
Brian.Bardwell@ChandraLaw.com

*Attorneys for Plaintiff Gregory Nelson*